## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

David Jeans, (R42876),     )
            )
     Petitioner,   )
            )  Case No. 18 C 2962
    v.       )
            )  Judge Jorge L. Alonso
John Varga, Warden,     )
Dixon Correctional Center,    )
            )
     Respondent.  )

## MEMORANDUM OPINION AND ORDER

Petitioner David Jeans, a prisoner at the Dixon Correctional Center, brings this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his 2014 armed habitual criminal conviction from the Circuit Court of Cook County. The Court denies the petition on the merits and declines to issue a certificate of appealability.

## I. Background

The Court draws the following factual history from the state court record, (Dkt. 14, 17, 19), including the Appellate Court of Illinois's decision on direct appeal. *Illinois v. Jeans*, No. 2016 IL App (1st) 141675-U, 2016 WL 7508127 (Ill. App. Ct. Dec. 29, 2016). The state appellate court's judgment is the operative decision under the Court's review because it was the last state court to address Petitioner's claims on the merits. *Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015) (citations omitted). The state court's factual findings have a presumption of correctness, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C. 2254(e)(1)). Petitioner has not made such as showing.

On the evening of December 23, 2012, a seven-person Chicago police team conducted a surveillance of the GoLo gas station in the 3700 block of West Roosevelt Road in the North Lawndale neighborhood of Chicago. *Jeans*, No. 2016 IL App (1st) 141675-U, 2016 WL 7508127, at *2. The police considered the gas station, which is located in the Chicago police department's 10th District, the largest "hot spot" for narcotics sales in the district. *Id*; (Dkt. 17-2, pg. 317.) The police identify a "hot spot" through statistical analysis of violent and narcotics crimes. *Id*. at 316. The gas station has outside pumps covered by a canopy with an inside convenience store. *Id*. at 324.

Sergeant Eric Olson, a twenty-year police veteran, led the team. *Id*. at 158. He supervised the 10th District's public violence mission team focusing on violence and narcotics hot spots in the district. *Id*. at 316. Olson established a surveillance post in an abandoned residential building next to the gas station. *Id*. at 321-22. He stationed himself on the building's second floor. *Id*. at 323. He observed the exterior of the gas station while hiding himself behind a set of slated blinds. *Id*. A broken window allowed Olson to hear what was being said outside the gas station. *Id*.

At approximately 8 p.m. that evening, Olson witnessed an unknown individual standing in the gas station parking lot yelling, "Sawbucks parts. Got that Weed. Sawbucks Parts." *Id*. at 325. Olson understood this to be street slang advertising a ten dollar bag of cannabis. *Id*. Olson is well-versed in the narcotics trade having observed hundreds of narcotics sales through his work with the Chicago police department. *Id*. at 327.

Olson saw a blue Honda pull into the gas station. *Id*. at 325. A man, later identified as Angel Aranjo, got out of the car and told the man advertising drugs that he (Aranjo) wanted three

bags.  *Id*. at 159, 326.  The man instructed Aranjo to go into the gas station convenience store.  *Id*.  Less than a minute later, Olson observed Aranjo return to his car with an item in his hand.  *Id*. at 327.  He could see Aranjo manipulating the bag.  *Id*. at 327-28.  Olson explained that, based on his years of experience, Aranjo was manipulating the bag in a manner consistent with how he had seen narcotics purchasers handle drugs in the past.  *Id*. at 328.

Olson radioed other members of his team instructing them to stop the Honda.  *Id*.  The other officers pulled over the car and arrested Aranjo for possession of suspected cannabis.  *Id*. at 329.  Following the arrest, Chicago police officer Nicholas Garcia, another member of Olson's team, picked up Olson and they headed to the gas station.  *Id*. at 330.

Garcia had been involved with the arrest of Aranjo before coming back for Olson.  *Id*. at 330.  Garcia related to Olson that Aranjo said he bought the drugs at the GoLo gas station from a black man wearing a white t-shirt and blue jeans.  *Id*.  Olson and Garcia went into the gas station convenience store to continue their investigation.  *Id*. at 331.  They encountered Petitioner in the store.  The interaction between Olson, Garcia, and Petitioner was recorded by the gas station's security camera.  The Court reviewed the camera video provided in the record.  (Dkt. 19.)  The video in the record does not have sound.

The Court draws the following freeze frame images from the video in the record.  The first is the opening scene when the video begins.  The second is Petitioner entering the store approximately one minute and fifty seconds into the video.  Olson and Garcia enter approximately two minutes later.





4

Petitioner walks over and stands by the store counter where he remains while making a telephone call.



He gives what appears to be a friendly fist bump to the store clerk, who is out of camera view, while continuing his call. Following the fist bump, Petitioner is standing facing the store entrance in close proximity to the store counter.



Several other customers come and go through the store while Petitioner is on the phone. None of the other customers speak to Petitioner. Other than the apparent fist bump with the store clerk, Petitioner does not interact with anyone else besides the police officers. He spends his time on the phone while in the store. There is nothing on the video suggesting that Petitioner sold drugs directly to Aranjo.

A second African American man also wearing a blue jacket, a white t-shirt and jeans enters the store at the video's three minute and fifteen second mark. Petitioner finishes his call around the three minute and thirty second mark. The other man wearing a blue jacket is visible in the first image below. In the second image, he is still in the store, but has walked down the far

merchandise aisle beyond the camera's view.





Petitioner makes a second call. The second man in a blue jacket remains in the store out of camera view. Approximately three minutes and forty-five seconds into the video, the second man reappears from the merchandise aisle and walks over to the store counter, while Petitioner ends his phone call.





At approximately four minutes and five seconds into the video, the second man has walked back towards the merchandise shelves while Petitioner is again on his phone. Olson enters the store and can be seen in the doorway. Petitioner is facing towards the door with his body at an almost 90-degree angle to the store counter. Olson immediately confronts the second man in a blue jacket. The tan support pole blocks the camera's view of Olson.





The second man in a blue jacket appears to move his head back to the right in apparent

frustration when confronted by Olson.  The man then raises his hands while Olson places both

hands inside the man's coat pockets.   According to the video time stamp, Olson has been in the store for a total of two seconds by this point.   Petitioner moves closer to the store counter and turns himself closer to the counter while Olson continues his search of the second man.   Petitioner continues his call.

Finding nothing in the second man's jacket, Olson reaches into the second man's left and right front pants pockets.   Olson has been in the store for eight seconds at this point.   Petitioner continues to move himself closer to the counter, now standing directly in front of the cashier with his right hand on the counter.   He continues to hold his phone with his left hand to his left ear.





Garcia enters the store fourteen seconds after Olson.   Petitioner now has his phone cradled between his left shoulder and ear, while both hands are on the store counter.   Petitioner has moved himself close to the counter.   His waist is either touching the counter or in very close proximity to it.

Olson moves toward Petitioner while Garcia is with the second man.   Petitioner turns his head, but the rest of his body remains at a 90-degree angle to Olson and he remains next to the counter.



Olson and Petitioner engage in a discussion for approximately six seconds. Petitioner turns his head to speak to Olson, but the remainder of his body is facing the store counter.

Petitioner's waist appears to be touching or in very close proximity to the counter. Petitioner is at a 90-degree angle to Olson throughout their conversation. The image below is representative of Olson and Petitioner's relative positions to each other during the six-second discussion.



Following the six seconds of discussion, Olson places his hand on the exterior of Petitioner's clothing by Petitioner's lower back. Petitioner's right hand is now by his right side.



   Olson removes his hand from Petitioner.    Petitioner and Olson continue to talk for another eight seconds.   Petitioner continues to stand at a 90-degree angle to Olson.   Garcia walks over from the other man and stands behind Olson while he is speaking to Petitioner during the eight seconds.



Garcia then walks around to Petitioner's other side while he and Olson begin physical contact with Petitioner.    Two points of note.

First, Petitioner and Olson had a fifteen-second conversation between the time that Olson first approached Petitioner and the commencement of the physical contact by the officers. Petitioner always kept his body touching or in very close proximity to the counter while standing at a 90-degree angle towards Olson, and only turned his head to speak to Olson.    Petitioner's hands remain by his side while the officers commenced the search.

Second, the video does not conclusively show whether Olson and Garcia are only touching the outside of Petitioner's clothing or reaching into Petitioner's pockets during the physical contact.



Petitioner's hands remain by his sides and he begins to hunch over during the physical contact. The video is unclear whether Petitioner is struggling against the officers to keep his hands down by his sides, or if the officers are holding his arms down.

Olson then steps back and reaches for his gun while Petitioner stands upright and raises his right hand.



    Two seconds later, Olson draws his weapon pointing it at Petitioner.　　Three seconds after

that, Garcia removes a firearm from Petitioner's right side placing the gun on the floor.　　The seized

gun is visible in Garcia's left hand in the second picture below, and in his right hand in the third picture.   The officers place Petitioner under arrest and secure the recovered weapon.







Following his indictment, Petitioner moved to quash the arrest and suppress the gun. *Jeans*, No. 2016 IL App (1st) 141675-U, 2016 WL 7508127, at *2. Defense counsel confirmed at a court status hearing a month and a half before the suppression hearing that he had received a copy of the gas station surveillance video from the prosecution. *Id*; (Dkt. 17-2, pg. 145.) The video was not introduced into evidence at the suppression hearing but was introduced at trial. *Jeans*, No. 2016 IL App (1st) 141675-U, 2016 WL 7508127, at *2.

Olson testified at the suppression hearing that he identified himself as a police officer when he approached Petitioner. *Id*. He said Petitioner became "agitated" and "took a bladed stance," of "turn[ing] his right side away from Olson." *Id*. Olson became suspicious because Petitioner concealed his right side from him. *Id*.

Olson characterized his physical interaction with Petitioner as a "pat down." (Dkt. 17-2, pg. 155.) He explained that his normal practice was to conduct a protective pat down during the

20

course of any interview in areas that he knows have high crime and violence.  *Id*. at 166.

Garcia also testified at the suppression hearing, and he too characterized the physical interaction with Petitioner as a "pat down."  *Id*. at 170.  Garcia was clear to testify that he only patted down over the exterior of Petitioner's clothes.  *Id*.  He could feel the round nature of the gun barrel while patting down Petitioner's right side.  *Id*.  He then told Olson he found a gun which he then retrieved from Petitioner's pocket.  *Id*.  Olson confirmed that Garcia was the one who felt the gun.  *Id*. at 167.  The trial court denied the motion to suppress the gun and quash the arrest.  *Jeans*, 2016 IL App (1st) 141675-U, 2016 WL 7508127, at *2.

Both Olson and Garcia testified at trial.  Of relevance, Olson characterize the interaction with the second man as a "brief protective pat-down."  *Id*. at *3.  At trial, Garcia conceded that Olson went through the second man's pockets explaining that "the purpose of a pat down is to find a weapon," despite the fact that he and Olson were looking for the man who allegedly sold drugs to Aranjo.  *Id*.  Petitioner's girlfriend testified on his behalf that they stopped at the store so he could buy cigarettes.  *Id*.  Petitioner was found guilty and sentenced to 20 years' of imprisonment.  *Id*. at *4.

Petitioner, represented by new counsel on appeal, brought two claims before the Appellate Court of Illinois: (1) a Fourth Amendment challenge arguing that the trial court erred in denying his motion to quash his arrest and suppress evidence; and, (2) a Sixth Amendment ineffective assistance of trial counsel claim for failing to introduce the gas station video surveillance at the suppression hearing.  *Id*.

The state appellate court held that the video is inconclusive as to the scope of physical contact between the officers and Petitioner.  *Id*. at 9.  In responding to Petitioner's argument that

the video shows an improper frisk because the officers reached directly into Petitioner's pockets like the other man searched, the state appellate court explained:

> But having carefully reviewed the video numerous times, we cannot determine that either officer immediately reached into defendant's pockets. In the video, defendant's body is positioned between the camera and Sergeant Olson. There is no clear indication that Olson immediately reaches into the pockets of defendant's pants or sweatshirt. Similarly, when Officer Garcia circles defendant and begins to search his right side, defendant leans over, obscuring the location of Garcia's hands. There is no clear shot of Garcia immediately reaching into defendant's pockets. While Garcia did, ultimately, reach into defendant's pocket to retrieve the handgun, it is impossible to tell whether he did so after he had touched the handgun through defendant's clothing. Indeed, if anything, the video appears to refute defendant's position, showing that Garcia first patted down defendant before reaching into defendant's pocket—but, at best, the video is inconclusive. Thus, we cannot agree that the video conclusively establishes that the officers exceeded the permissible scope of the frisk.

*Id*. Petitioner repeated his arguments in a petition for leave to appeal, (Dkt. 14-6.) which the Supreme Court of Illinois denied. *Illinois v. Jeans*, No. 121986, 84 N.E.3d 366 (Ill. May 24, 2017) (Table). Having completed his state court proceedings, Petitioner now brings the present habeas corpus petition. (Dkt. 1.)

## II.     Analysis

Petitioner raises three claims in his habeas corpus petition: (1) the *Terry* stop and frisk violated his Fourth Amendment rights; (2) his trial attorney was ineffective for failing to introduce the gas station surveillance video at the suppression hearing; and, (3) his Confrontation Clause rights were violated.

### A.     Claim One

Petitioner argues that the police search resulting in the discovery of the gun violated his Fourth Amendment rights. This claim is denied as non cognizable.

"*Stone v. Powell*, bars a federal habeas court from reaching the merits of a petitioner's Fourth Amendment claim so long as the state court granted him a full and fair hearing on the claim." *Monroe v. Davis*, 712 F.3d 1106, 1112 (7th Cir. 2013) (citing 428 U.S. 465, 494 (1975)). "Absent a subversion of the hearing process," such as the trial judge "has his mind closed to the necessity of a hearing, was bribed," "sleepwalking," or "in some other obvious way was subvert[ing] the hearing," a prisoner cannot challenge its result in a federal habeas corpus proceeding. *Cabrera v. Hinsley*, 324 F.3d 527, 531-32 (7th Cir. 2003). "In short, 'full and fair' guarantees the right to present one's case, but it does not guarantee a correct result." *Id.* at 532.

The *Stone* standard is predicated upon the fact that the prisoner is attempting to receive the benefit of the judicially created exclusionary rule. *Kimmelman v. Morrison*, 477 U.S. 365, 375-76 (1986). The Supreme Court has "emphasized repeatedly that the government's use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution," and with that, the exclusionary rule does not automatically apply in every situation, but instead should be applied only when the deterrence benefits outweigh the substantial societal costs of suppressing evidence. *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 362-63 (1998) (internal quotation marks and citations omitted). *Stone* concluded that the exclusionary rule should not be extended to habeas corpus proceedings, as long as there had been a full and fair hearing in the state court, because the societal cost of suppressing evidence in a habeas corpus proceeding outweighed the deterrence effect. 428 U.S. at 495.

In the instant case, a review of the record shows that Petitioner received a full and fair hearing of his Fourth Amendment claim in the state court. *Stone v. Powell*, bars this Court's consideration of the claim in the present habeas corpus proceeding. Claim One is denied.

**B.      Ground Two**

Petitioner next argues that his lawyer was ineffective for failing to introduce the gas station surveillance video at the suppression hearing.   The Court applies the Antiterrorism and Effective Death Penalty standard to this claim because it was resolved on the merits by the state court. *Makiel*, 782 F.3d at 896.   Under the AEDPA standard, the Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court decision is based on an unreasonable determination of facts.   28 U.S.C. § 2254(d). This "standard is intentionally difficult for Petitioner to meet."   *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam).   It requires this Court to give state court decisions the "benefit of the doubt."   *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

The state appellate court properly recognized that Petitioner's claim was governed by the *Strickland* standard.   *Jeans*, No. 2016 IL App (1st) 141675-U, 2016 WL 7508127, at *9.   Thus, Petitioner cannot make a contrary to argument under § 2254(d).

To show ineffective assistance of counsel, Petitioner must demonstrate: (1) deficient performance by his attorney; and, (2) prejudice.   *Premo v. Moore*, 562 U.S. 115, 121 (2011); *Strickland v. Washington*, 466 U.S. 668 (1984).   Regarding the prejudice prong, Petitioner must demonstrate that "his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."   *Kimmelman*, 477 U.S. at 375.   The state appellate court properly identified this prejudice standard.   *Jeans*, No. 2016 IL App (1st) 141675-U, 2016 WL 7508127, at *9.   The fact the state court did not cite to *Kimmelman* is of no moment because the state court

24

need not "cite or even be aware" of the controlling Supreme Court cases as along as the state court does not contradict the clearly established federal law from the Supreme Court. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

It has been argued that *Kimmelman's* standard allows a "Fourth Amendment claim [which is barred under *Stone v. Powell*] to be smuggled in by the back-door route of the Sixth Amendment claim." *Owens v. United States*, 387 F.3d 607, 609 (7th Cir. 2004). However, the Court is not considering a freestanding Fourth Amendment claim, but instead the "Fourth Amendment claim is one element of proof of [the] Sixth Amendment claim . . . ." *Kimmelman*, 477 U.S. at 375. This Court, like the state appellate court, is considering the Fourth Amendment law only within the context of the Sixth Amendment claim.

Turning to *Strickland's* performance prong, there is nothing in the record to explain why defense counsel failed to introduce the surveillance video at the suppression hearing. The video could have assisted defense counsel in exploring the officers' credibility at the hearing to the extent that the video contradicted the officers' testimony. Thus, the Court must turn to the prejudice question.

As explained above, the Court must consider whether Petitioner's motion to suppress would have been meritorious had defense counsel introduced the surveillance video at the suppression hearing. *Kimmelman*, 477 U.S. at 375. The state appellate court properly recognized that *Terry v. Ohio*, 392 U.S. 1 (1986), governs the suppression question. *Jeans*, No. 2016 IL App (1st) 141675-U, 2016 WL 7508127, at *9-10.

The Court must consider three questions: (1) was there reasonable suspicion to conduct a *Terry* stop of Petitioner; (2) was there reasonable suspicion for a protective pat down of Petitioner;

and, (3) did Officer Garcia conduct a proper *Terry* pat down of Petitioner resulting in the seizure of the gun?   The answer to these questions will demonstrate whether there was prejudice under *Strickland*, and in turn, whether or not the state appellate court unreasonably applied *Strickland* in light of § 2254(d)(1).

### 1.        Suspicion for the Stop

*Terry* allows law enforcement to make a brief investigative stop if they reasonably suspect that an individual has committed or is about to commit a crime.   392 U.S. at 20-22; *Torry v. City of Chicago*, 932 F.3d 579, 587 (7th Cir. 2019).   "While 'inarticulate hunches' are not enough, 'reasonable suspicion is a lower threshold than probable cause.'"   *United States v. Adair*, 925 F.3d 931, 935 (7th Cir. 2019) (quoting *Terry*, 392 U.S. at 22; *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015); *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011)).   The Court looks to the totality of the circumstances in deciding if there was sufficient cause to support the officers' actions.   *United States v. Sokolow*, 490 U.S. 1, 8 (1989).   The question of whether there is sufficient suspicion to justify a *Terry* stop is an objective question.   *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Turning to the instant case, there was sufficient cause to justify the police's initial questioning of Petitioner.   Multiple facts led the police to conduct the *Terry* stop:

1.        He was at the GoLo gas station, a location the police identified as the number one hot spot for narcotics in the police district.

2.        The police surveillance of the gas station, led by Sergeant Olson, identified a possible drug sale at the station.

3.  Police found drugs in Aranjo's possession when they arrested him immediately after leaving the gas station.

4.  Petitioner fit the description Aranjo gave to police for the drug dealer of an African American man wearing a white t-shirt and blue jeans.

5.  The police confronted Petitioner immediately after arresting Aranjo.

6.  Petitioner did not turn his body towards Olson, instead standing in what Olson characterized as a "bladed" stance when Olson spoke to Petitioner, in an apparent attempt to conceal his right side from Olson.

An evaluation of the foregoing factors shows there was sufficient reasonable suspicion to justify the investigative *Terry* stop of Petitioner to question him. First, although an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979); *Adams v. Williams*, 407 U.S. 143, 144, 147-148 (1972)). Petitioner's presence at a gas station known as a "hot spot" for narcotics is a factor to support reasonable suspicion.

Second, a suspected drug transaction occurred in the gas station store mere moments before the officers entered the store. The officers both observed events leading to the transaction and attempted to confirmed it through the arrest of Aranjo. It was reasonable for the officers to continue their investigation inside the store to locate the possible drug dealer.

Third, there is the description of the potential drug dealer that matched Petitioner. It is true that the description is not very detailed --- African American man, white T-shirt and blue jeans --- but it should be remembered that the description was not the only piece of information leading the police to Petitioner. Petitioner was in the store matching this description immediately after the purported drug deal observed by the police officers (with a corresponding arrest and drug seizure) resulting from their surveillance operation.

It is true that the "Supreme Court's decisions in this area 'have consistently recognized the value of corroboration of details of an informant's tip by independent police work.'" *United States v. Lopez*, 907 F.3d 472, 480 (7th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 241 (1983)). But this is not a situation like *Florida v. J.L.*, where the police's actions were instigated solely by an anonymous tip and the officers performed no independent police work to verify the tip. 529 U.S. 266 (2000).

The officers were engaged in good police work up to this point. The police used statistical analysis to identify the gas station as the leading narcotics hotspot in the district. They assembled a seven-person team and conducted a surveillance operation to observe drug deals at the gas station. Olson observed a man advertising drugs outside the gas station. The police arrested a purported drug purchaser after he spoke to the advertiser and went into the gas station, seized drugs, and obtained a description of the possible drug dealer from the arrestee.

*Terry* does not require a police officer to "shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams*, 407 U.S. at 145. "On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an immediate response." *Id.* "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily

while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id*. It was eminently proper for reasonable police officers to follow up forthwith on the investigation by going to the gas station to see if they could locate a person matching the description for further investigation.

It is true that the gas station's surveillance video does not show Petitioner selling drugs to anyone coming into the store. However, the officers were only conducting surveillance outside the store, and did not have access to the gas station video at that time. The officers had no reason to exclude Petitioner as a suspect when they entered the store and conducted the *Terry* stop.

The final fact in support of the *Terry* stop is Petitioner's evasiveness as shown by the fact that he moved his body towards the counter and would not turn towards Sergeant Olson when being questioned. Petitioner had his body facing the door for much of the time he was in the gas station, but immediately turned and walked towards the counter when the police entered the store. He kept the front of his body facing the counter even when Olson began to speak to him. Although Petitioner did not flee from the store, he attempts to conceal his front and right side from the police. "Evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124.

All of these facts --- (1) Petitioner's presence in a high crime area; (2) a recent drug transaction witnessed and confirmed by police through arrest and drug seizure; (3) Petitioner fitting the description of a drug dealer; and (4) evasive behavior by Petitioner when questioned by the police --- when considered under the totality of the circumstances demonstrate there was reasonable suspicion for the police to conduct a *Terry* stop of Petitioner inside the gas station. Additionally, the Court's review is under the deferential standard of the AEDPA. Not only is

there cause for an investigatory stop, but Petitioner certainly cannot overcome the deferential AEDPA standard when challenging the state appellate court ruling on this point.

### 2. Suspicion for the Pat Down

The Court turns to the scope of the physical interaction between Petitioner and the officers. *Terry* holds that the police officer may protect himself and others in the area by conducting a "carefully limited search of the outer clothing" of a person whom the officer has reasonable suspicion to believe is armed and dangerous in order to attempt to discover weapons that might be used to harm the officer. 392 U.S. at 30. An officer conducting a "reasonable investigatory stop [pursuant to *Terry*] should not be denied the opportunity to protect himself from attack by a hostile suspect." *Adams*, 407 U.S. at 146.

The purpose of a *Terry* pat down is "'not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Adams*, 407 U.S. at 146). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Dickerson*, 508 U.S. at 373 (citing *Sibron v. New York*, 392 U.S. 40, 65-66 (1968)). Once the officer has cause to believe the offender is armed, the officer may reach inside the offender's clothing and seize the weapon to protect himself from the offender. *Adams*, 407 U.S. at 148.

The fact that Petitioner was present in a high crime area and was suspected in a drug transaction, is not, by itself, enough to allow the officers to conduct a protective pat down. *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013) (citing *Maryland v. Blue*, 494 U.S. 325, 334 n.2 (1990); *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979)). It is true that guns are often tools of the

drug trade, *United States v. Vaughn*, 585 F.3d 1024, 1029 (7th Cir. 2009), but there still must be "'reasonably, individualized suspicion before a frisk for weapons can be conducted.'" *United States v. Williams*, 731 F.3d 678, 687 (7th Cir. 2013) (quoting *Blue*, 494 U.S. at 342 n.2).

Here, it is not simply that Petitioner was in a high crime area and was suspected in a drug crime. It is also that Petitioner showed signs of evasion when confronted by the police, and, most notably, attempted to conceal part of his body from the police.

The Supreme Court instructs that a suspect's presence in a high crime heavy narcotics trafficking area plus the suspect's unprovoked flight in response to seeing the police is sufficient grounds for an officer to conduct a protective pat down. *Wardlow*, 528 U.S. at 124-25. Although a "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure," "unprovoked flight is not a mere refusal to cooperate," but instead is a "consummate act of evasion." *Id*. at 124-25 (internal quotation marks and citations omitted).

Here, Petitioner did not flee, but did turn his body to shield it immediately when the police entered the store. He was initially facing the store entrance a few steps from the counter. However, he moved himself to his front facing the counter, and his right side (where his gun was later discovered), away from the police. Sergeant Olson was in the store when Petitioner moved himself towards the counter giving Olson the opportunity to observe Petitioner's action to conceal parts of his body from police view.

Furthermore, Petitioner only turned his head to speak to Olson when questioned by the police. Petitioner kept his right side away from the police at all times during questioning requiring Officer Garcia to circle around to Petitioner's right side to perform the pat down.

It is true that *Wardlow* considered flight, while here Petitioner did not flee but instead attempted to conceal portions of himself from police view. But, concealment of one's body can be done to conceal a weapon. For example, in *United States v. Oglesby*, the police officer in that case testified in the suppression hearing that police officers are trained to stand at an angled stance to shield their weapons when confronting a potentially dangerous suspect. 597 F.3d 891, 894 (7th Cir. 2010). The Seventh Circuit held it was reasonable for the officers to conclude that the suspect was potentially armed when the suspect took an angled stance shielding one side of his body from the police. *Id*. The angled stance, along with the fact that the suspect had slowly backed away from the police, provided sufficient grounds for a protective pat down under *Terry*. *Id*. at 895.

While it is true that Petitioner did not flee, the video shows that he had nowhere to go. The police officers were blocking the store exit and Petitioner appears to be in a back corner of the store surrounded by shelves. Petitioner availed himself of every opportunity to conceal his body from the police short of fleeing under the circumstances he faced.

The Court appreciates the closeness of the question regarding whether there was sufficient suspicion for a protective pat down in this case. In contrast to *Wardlow* and *Oglesby*, where the pat down was proper, *United States v. Williams* held that there was insufficient suspicion to support a pat down for weapons in that case. 731 F.3d 678 (7th Cir. 2013). In *Williams*, the police responded to an anonymous 911 call of three or four men displaying guns in a group of 25 men in a parking lot outside a bar close to midnight in a high crime area. *Id*. at 680. The officers did not find anyone displaying guns when responding to the call. *Id*. The fact that the defendant had his hands in his pockets or waistband, avoided eye contact, and began to move away from the area

was insufficient to justify the pat down.  *Id*. at 686-87.  Judge Ripple dissented from the panel opinion arguing that the pat down was constitutional.  *Id*. at 694-99 (Ripple, J., dissenting).

*Wardlow*, *Oglesby,* and *Williams*, illustrate the closeness of the present question of whether the officers had reasonable suspicion to pat down Petitioner.  The dispositive point resolving this issue is that the case is governed by the AEDPA.  It is designed to preclude prisoners from winning on close issues.

The AEDPA is "meant to be" a "difficult" standard for prisoners to meet.  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurist could disagree" on the correctness of the state court's decision."  *Id*. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  To win, Petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possible fairminded disagreement."  *Harrington*, 562 U.S. at 103.  This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'"  *Cullen*, 563 U.S. at 181 (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).  The present issue is a close one, not the clear cut error that the AEDPA requires for relief.

Additionally, this is a fact intensive question.  "'Evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'"  *Harrington*, 562 U.S. at 101 (quoting *Yarborough*, 541 U.S. at 664).  The fact intensive nature of *Terry* is a secondary barrier to relief for Petitioner.  In sum, the state appellate court's conclusion that there was

reasonable suspicion to conduct a pat down of Petitioner was not an unreasonable determination under *Terry* in light of the deferential AEDPA standard.

### 3. Execution of the Pat Down

The final question is whether the officers conducted a permissible pat down under *Terry*. As explained above, the *Terry* pat down must be: (1) limited to the suspect's outer clothing; (2) limited to the purpose of protecting the officer and not done to discover evidence of a crime; and, (3) the officer must have reasonable cause to believe the suspect is armed in order to reach under the suspect's clothing to retrieve the weapon. *Dickerson*, 508 U.S. at 373; *Adams*, 407 U.S. at 146; *Terry*, 392 U.S. at 30.

Officer Garcia testified at the suppression hearing that he only patted down the exterior of Petitioner's clothing. (Dkt. 17-2, pg. 170.) Through the exterior pat down around Petitioner's right pants pocket, Garcia claims he felt a round object that he believed to be a gun barrel. *Id*. Garcia states he reached into Petitioner's pocket only after he felt the gun barrel.

The state appellate court concluded that the gas station video was inconclusive on the question of whether Garcia conducted an exterior pat down first, or instead immediately reached into Petitioner's pockets. *Jeans*, No. 2016 IL App (1st) 141675-U, 2016 WL 7508127, at *9. The Court agrees with the state appellate court that the video is inconclusive on this point. This leaves Garcia's unrebutted testimony that he patted down the exterior of Petitioner's clothes, and reached into Petitioner's pocket only after feeling the gun barrel. Garcia's testimony, which the state court relies upon to uphold the pat down, is a factual finding. Under the AEDPA, factual findings have a presumption of correctness, and the prisoner has the burden of rebutting the presumption. *Brumfield*, 135 S. Ct. at 2282 (citing 28 U.S.C. 2254(e)(1)). Petitioner does not

rebut the presumption. Thus, under the AEDPA, the Court must afford a presumption of correctness to the state court's factual finding that Garcia initially touched the outside of Petitioner's clothing during the pat down and reached into Petitioner's pocket only after he had felt a gun through Petitioner's clothing.

It is true that the video shows Olson placing his hands into the first man's jacket and pants when Olson enters the store. In fact, Olson testified it was his practice to conduct protective searches of any person he questioned in a high crime area. (Dkt. 17-2, pg. 172.)

But Olson's reaching into the first man's pockets, as well as his "practice" of conducting protective searches, is of little to no relevance to this case. Olson did not engage in the same or similar conduct with Petitioner, but instead, conversed with Petitioner for 15 seconds before the gun was discovered. Additionally, and more importantly, Garcia, not Olson, engaged in the conduct that led to the discovery of the gun. Petitioner's contention—that Garcia's conduct, which cannot be determined from the video, was not a pat down but a full search because the video shows that Olson impermissibly reached into the first man's pocket—is insufficient to establish ineffective assistance by Petitioner's attorney.

In sum, the state appellate court's holding that there is no *Strickland* violation because Petitioner was not prejudiced by the failure to introduce the surveillance video at his suppression hearing was not contrary to, or an unreasonable determination of, *Strickland*. Claim Two is denied.

### C. Claim Three

Petitioner's final claim is his confrontation rights were violated because he was unable to confront the out of court statement made by Aranjo. Respondent is correct that that claim is

procedurally defaulted. To preserve a claim for review in a federal habeas corpus proceeding, Petitioner must present his claim to the state courts so that they may have a fair opportunity to adjudicate the claim. *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006). Petitioner failed to present the confrontation right claim to the state courts, and the time for raising a claim is now expired. (Dkt. 14, 17, 19.)

Petitioner cannot excuse his default through either cause and prejudice nor fundamental miscarriage of justice. Regarding cause and prejudice, cause is an "'objective factor, external to [Petitioner] that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or, (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)). The first two types of cause are not applicable to this case.

As to the final type of cause, an ineffective assistance of counsel claim asserted to excuse a default must, itself, be properly preserved in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Petitioner has not done that.

Petitioner's exhausted ineffective assistance of counsel claim for failing to submit the surveillance video at the suppression hearing cannot be used to excuse the default of the present confrontation claim. Although ineffective assistance of counsel is a single claim, *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)), Petitioner must raise the particular factual basis for each aspect of the alleged ineffective assistance of counsel to preserve the respective argument. *Pole*, 570 F.3d at 935

36

(citing *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007)). "A bare mention of ineffective assistance of counsel is not sufficient to avoid a procedural default; [Petitioner] must have 'identified the specific acts or omissions of counsel that form the basis for [his] claim of ineffective assistance.'" *Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (quoting *Momient-El v. DeTella*, 118 F.3d 535, 541 (7th Cir. 1997)). "Petitioner cannot argue one theory [of ineffective assistance of counsel] to the state courts and another theory, based on different facts, to the federal court." *Johnson*, 574 F.3d at 432 (citing *Everett v. Barnett*, 162 F.3d 498, 502 (7th Cir. 1998)). Petitioner cannot excuse his default through cause and prejudice.

This leaves Petitioner with the fundamental miscarriage of justice (actual innocence) gateway to excuse his default. To show actual innocence to defeat a default, Petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggins v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggins*, 133 S. Ct. at 1928 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial --- such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence --- to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")). Petitioner provides no new evidence suggesting he is innocent. Claim Three is procedurally defaulted.

Beyond the default, the claim is meritless. Aranjo's statement was used at both Petitioner's suppression hearing and trial. However, the Confrontation Clause is inapplicable at a suppression hearing. *Ebert v. Gaetz*, 610 F.3d 404, 414 (7th Cir. 2010).

Equally, there is no Confrontation Clause violation with the use of Aranjo's out-of-court statement at Petitioner's trial. "Admitting a witness's out-of-court testimonial statements when that witness is available to testify violates the accused's Sixth Amendment right of confrontation, but not when those statements are offered for a purpose 'other than establishing the truth of the matter asserted.'" *United States v. Gaytan*, 649 F.3d 573, 579 (7th Cir. 2011) (citing *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004)). Aranjo's statement was not used at trial to establish the truth of the matter asserted. His statement gave a description of the drug dealer. The introduction of the statement at trial explained to the jury why the officers went into the gas station confronting Petitioner. The statement was not used at trial to prove that Petitioner was a drug dealer. In fact, Petitioner was not charged with drug dealing, his charge was being an armed habitual criminal. Claim Three is denied. The habeas corpus petition is denied.

## III.   Certificate of Appealability

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right, or that reasonable jurists would debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of

judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## IV.      Conclusion

Petitioner's habeas corpus petition (Dkt. 1.) is denied on the merits. Any pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to enter a judgment in favor of Respondent and against Petitioner. Civil case terminated.

**SO ORDERED.**                                              **ENTERED: October 2, 2019**

 

 

_____
**HON. JORGE ALONSO**
**United States District Judge**